UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KEITH JACKSON,<br><br>      Plaintiff,<br><br>v.<br><br>NORTHERN ILLINOIS UNIVERSITY, THE BOARD OF TRUSTEES OF NORTHERN ILLINOIS UNIVERSITY, NANCY SUTTENFIELD, and DOUGLAS BAKER,<br><br>      Defendants. | <br><br><br><br><br><br><br><br><br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT AT LAW

Plaintiff, KEITH JACKSON, by and through his attorneys, CAFFARELLI & ASSOCIATES LTD., for his Complaint at Law against Defendants NORTHERN ILLINOIS UNIVERSITY, THE BOARD OF TRUSTEES OF NORTHERN ILLINOIS UNIVERSITY, NANCY SUTTENFIELD, and DOUGLAS BAKER, hereby states as follows:

### JURISDICTION AND VENUE

1. This Court has original jurisdiction over counts I and II pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 1343(a)(3) (42 U.S.C. § 1983 jurisdiction). This Court has supplemental jurisdiction over the remaining counts pursuant to 28 U.S.C. § 1367.

2. Plaintiff is alleging that Defendants denied him substantive and procedural due process in violation of the Due Process Clause of the U.S. Constitution and 42 U.S.C. § 1983– by placing him on involuntary administrative leave, threatening to terminate him for cause, failing to process his grievances, and ultimately terminating him as described herein.

3. Plaintiff seeks injunctive relief, compensatory and other relief for the injuries caused by Defendants' unlawful conduct, and punitive damages for their intentional, malicious and

wanton violation of the Plaintiff's rights.

4. The Eastern Division of the Northern District of Illinois is the proper venue for this action, pursuant to 28 U.S.C. § 1391(b), in that a substantial part of the events and omissions giving rise to Mr. Jackson's claims occurred in this district, and Defendant Northern Illinois University ("NIU" or the "University") maintains a campus which is located, in part, in the Eastern Division of the Northern District of Illinois.

**PARTIES**

5. Plaintiff Keith Jackson ("Jackson" or "Plaintiff") is an adult resident of the State of Illinois currently residing at 13288 Hinckley Road, Hinckley, Illinois 60520.

6. Defendant Board of Trustees of Northern Illinois University (the "Board") is the body politic and corporate authorized by Illinois law to operate, manage, control, and maintain Defendant Northern Illinois University, an Illinois public university. Plaintiff only seeks injunctive relief against the Board.

7. Nancy Suttenfield is an adult resident of the State of North Carolina. At all times relevant to this Complaint, Defendant Suttenfield was interim Chief Financial Officer of NIU. All actions alleged in this Complaint to have been taken by Defendant Suttenfield were taken under color of state law within the meaning of 42 U.S.C. § 1983. Defendant Suttenfield is being sued in this matter in her individual capacity as well as her official capacity.

8. Defendant Douglas Baker is an adult resident of the State of Illinois. At all times relevant to this Complaint, Defendant Baker was President of NIU. All actions alleged in this Complaint to have been taken by Defendant Baker were taken under color of state law within the meaning of 42 U.S.C. § 1983. Defendant Baker is being sued in this matter in his individual capacity as well as his official capacity.

**FACTUAL ALLEGATIONS**

9. Keith Jackson has been the Controller for Northern Illinois University since October 1999; however, as explained below, from May, 2014 to the present day he has been barred from campus by Defendants Suttenfield and Baker, and placed on involuntary, "administrative" leave pending his termination of employment in February, 2016.

10. In October 2012, Keith Jackson was wrongfully arrested and charged with two felonies and a misdemeanor relating to the existence of a previously unknown bank account in NIU's Materials Management Department, which was known as the "Coffee Fund." Mr. Jackson was placed on involuntary "administrative" leave subsequent to his arrest, until January 2013. During the time he was on leave he was required to work from home and come into the office after business hours to complete audit requirements.

11. The Coffee Fund consisted of proceeds from metal recycling, which should have been turned over to the State of Illinois as required by law. The Fund allegedly was used to pay for coffee, office retirement parties, etc. in the Materials Management Department.

12. Though the existence of the Coffee Fund and Keith Jackson's arrest were widely reported in the local media, neither NIU nor any member of the administration made any statement refuting the charges against Mr. Jackson or in any way supportive of Mr. Jackson.

13. In fact, in his 2012 Thanksgiving message the then-President of the University implied that Mr. Jackson had engaged in wrongdoing by proclaiming that NIU was "also launching a management study of the University's accounting system, processes, procedures and policies . . . in the critical operational areas of accounting . . . ." The President's statement was

3

widely reported in the media, including the Daily Chronicle, and was viewed as a repudiation of Mr. Jackson, who weeks earlier had been arrested and charged with felonies.

14. On or about April 1, 2013, the DeKalb County State's Attorney backtracked and dismissed all charges against Keith Jackson in connection to the Coffee Fund. According to the prosecutor, it did not appear that Mr. Jackson was aware of the existence of the bank account and as a result had been wrongly accused and arrested.

15. In fact, the prosecutor determined that once the fund became a matter of public knowledge, Mr. Jackson actually took proper affirmative measures to place it under the University's control. The prosecutor also determined that Jackson acted fully and properly within the scope of his employment, and without criminal aim or purpose.

16. Subsequent to the charges being dropped, Mr. Jackson sought reimbursement of his legal fees from the University. Rather than simply reimburse him for his fees, administration first demanded that Mr. Jackson execute an indemnity agreement with NIU, which Mr. Jackson refused to sign. As a result, Jackson was made to wait over a year to be reimbursed.

17. In October 2103, Defendant Baker named Defendant Suttenfield to serve as the interim Chief Financial Officer, which would make her Mr. Jackson's direct supervisor. As part of this process, Keith Jackson was asked to sign off on her contract, under which all payments including placement fees would be made through an outside search firm, the Registry for College and University Presidents. Mr. Jackson refused to do so on the basis that the contract required the approval of the Board of Trustees, and because processing the payments would have violated the Illinois procurement laws that required competitive bidding. The Director of Procurement Services Al Mueller, who has since retired, also refused to approve the processing.

18. As a result of Mr. Jackson's refusal to violate Illinois law, Defendant Baker instead arranged for Defendant Suttenfield and the Registry to be paid through he Northern Illinois University Foundation, the charitable organization associated with Northern Illinois University. By doing this, Defendant Baker was able to evade Illinois' competitive bidding laws and requirements. Vice President of Administration Steve Cunningham ultimately signed the contract by in January 2014, and the Foundation made the first payment in February 2014.

19. Upon starting at the University, Ms. Suttenfield immediately exhibited hostility toward Keith Jackson. In their first meeting, alluding to his refusal to sign off on her contract, Defendant Suttenfield told Mr. Jackson "I know what you did."

20. Defendant Suttenfield then hired a forensic audit firm, Alvarez & Marsal, to dredge for evidence of wrongdoing by Mr. Jackson and other individuals that she and Defendant Baker were targeting for termination, including then-Vice President Kathy Buettner. In order to conceal her motive and evade Illinois laws governing competitive bidding, Defendant Suttenfield paid Alvarez & Marsal by diverting University funds intended for the law firm of Pugh Jones & Johnson, P.C. under an existing contract relating to an FBI investigation of the University's police department. After the investigation, no evidence was presented indicating that Mr. Jackson engaged in wrongdoing, or that there had been any accounting problems or irregularities under his watch. The firm's findings were not communicated to the public.

21. Frustrated with these findings, on May 13, 2014, Defendant Suttenfield called Mr. Jackson into a meeting with and told that the President (Defendant Baker) had decided that it was "time for [Mr. Jackson] to go," or words to that effect. This meeting was called without warning,

5

and Mr. Jackson had not previously received any verbal or written warning, discipline or other indication that his performance had been unsatisfactory.

22. During the meeting, Ms. Suttenfield told Mr. Jackson that he was immediately being placed on involuntary administrative leave, that he was to have no contact with his University colleagues, and that he must leave the campus and was not permitted to return.

23. Ms. Suttenfield then handed Mr. Jackson a "Resolution Agreement" and demanded that he sign it. The Resolution Agreement provided for two week's pay, no future employment, and a "neutral" reference in exchange for Mr. Jackson's immediate resignation.

24. Ms. Suttenfield told Mr. Jackson that if he did not sign the Agreement within three days the administration would "find" cause to terminate his employment.

25. During the May 13, 2014 meeting, Mr. Jackson was not informed of any deficiency in his performance or any other cause or rationale that would justify terminating his employment.

26. Mr. Jackson did not sign the Agreement presented to him at the May 13, 2014 meeting, and immediately upon leaving the meeting with Ms. Suttenfield discovered that his University e-mail account had been deactivated.

27. As the Controller, Mr. Jackson is a member of the Supportive Professional Staff ("SPS") for purposes of University rules and regulations, and thus entitled to receive at least 12-months' notice prior to termination without cause.

28. Pursuant to Item II(15)(VI) of the University's Personnel Policies and Procedures for Members of the Supportive Professional Staff ("SPS Procedures"): "Notification of Termination or Nonrenewal of Contract . . . all SPS are provided with the following notice of non-reappointment . . . 12 months from the date of notice except for cause."

29. There is no provision in the University's Personnel Policies or rules and regulations that provide for an SPS employee to be placed on involuntary administrative leave.

30. On May 21, 2014, Mr. Jackson filed a formal grievance against Ms. Suttenfield and Dr. Baker (the "First Grievance") for wrongfully placing him on involuntary administrative leave and wrongfully demanding his resignation without cause or justification.

31. On May 28, 2014 Mr. Jackson received via certified mail a letter from Ms. Suttenfield dated May 27, 2014, notifying him that the University "intends to initiate action to terminate your employment with the University," and attached written charges describing the purported bases to terminate Mr. Jackson for cause.

32. The written charges attached to Ms. Suttenfield's May 27, 2014 notice were either false or contained misrepresentations regarding supposed deficiencies in Mr. Jackson's work.

33. On June 4, 2014, Mr. Jackson responded to Ms. Suttenfield's letter and requested a pre-termination meeting to review and discuss the written charges, as well as access to his archived e-mail and the ability to speak with potential witnesses.

34. On July 3, 2014, Mr. Jackson filed a formal grievance (the "Second Grievance") against Ms. Suttenfield for wrongfully initiating the process to terminate his employment for cause where no such cause existed by fabricating bogus written charges, as a result of his refusal to sign the Resolution Agreement.

35. On July 15, 2014, Mr. Jackson met with Ms. Suttenfield and a representative from Human Resources. Even though Mr. Jackson had previously been informed that this would be an "informal meeting" a court reporter was present, and Ms. Suttenfield indicated that it would in fact be a "formal meeting" so that he could respond to the Charges.

36. During the July 15, 2014 meeting, after Mr. Jackson indicated that he disagreed with the written charges in their entirety, Ms. Suttenfield said, "I don't really believe that we have anything further to address" and immediately terminated the meeting without engaging in any attempt to ascertain the validity of the charges or Mr. Jackson's response thereto.

37. On October 15, 2014, a hearing was held as to the First Grievance. On October 20, 2014, the decision of the Grievance Committee was issued. The Committee determined that Ms. Suttenfield had failed to follow "best practices" in disciplining Mr. Jackson and recommended certain changes to the disciplinary practices.

38. On October 23, 2014, President Baker assigned the final review of the Grievance Committee's findings in the First Grievance to the Provost. The Provost subsequently made no final determination either upholding or denying the grievance, and as a result no changes were made and nothing came of the First Grievance.

39. On October 29, 2014, Mr. Jackson was informed that the Grievance Committee had denied his request for a hearing on the Second Grievance without explanation.

40. On February 24, 2015, Mr. Jackson received notification dated February 23, 2015, from the University's General Counsel Jerry Blakemore, acting on behalf of Defendant Baker and Defendant Suttenfield, that his SPS contract was not being renewed and that his employment would therefore terminate in February 2016.

41. On March 06, 2015, Mr. Jackson filed a grievance filed against Blakemore as a result of the above notification (the "Third Grievance"). Mr. Blakemore and the University did not respond to the grievance.

42. On April 20, 2015, Mr. Jackson requested a hearing for the Third Grievance. On May 27, 2015, Mr. Jackson received notice that his request for a hearing for the Third Grievance was being denied without explanation.

43. To date, Mr. Jackson remains on involuntary "administrative" leave and is prohibited from entering campus or communicating with his University colleagues.

44. President Baker and the current University administration have engaged in a pattern and practice of placing University employees on immediate involuntary administrative leave, cutting off their access to e-mail, barring them from campus, and wrongly threatening to fabricate bogus charges in order to pressure them to sign separation agreements whereby they waive their rights and "voluntarily" resign, thus willfully and maliciously flouting the University's own procedures regarding notice and other administrative requirements.

45. Other employees who have been wrongfully pressured to resign under threat of immediate termination under false pretenses include Assistant Controller Barbara Seldal, Associate Vice President Jeff Dauer, Vice President Steve Cunningham, Vice President Kathy Buettner, Facilities Foreman John Boudin, and Director of Facilities Kevin Howard.

46. As a result of the above, Mr. Jackson has been deprived of his property and liberty without due process, in violation of the United States Constitution, and has suffered damages as a result including but not limited to severe humiliation, emotional distress, damage to his reputation, lost future wages, and diminished earning capacity.

47. Defendants' conduct was driven by evil motive or intent, and as evidenced by the pattern and practice of targeting the Plaintiff, diverting state funds to engage in a search for incriminating information against targeted employees such as the Plaintiff in the absence of any indicia of wrongdoing, wrongfully threatening to bring and actually bringing false and wrongful

charges against employees that failed to voluntarily resign and waive their rights, all of which involved a reckless or callous indifference to Mr. Jackson's rights under the Constitution as a public employee, warranting the imposition of punitive damages.

## COUNT I – DENIAL OF PROCEDURAL DUE PROCESS
## UNDER THE U.S. CONSTITUTION AND 42 U.S.C. § 1983

48. This Count is brought pursuant to the Fifth and Fourteenth Amendments to the United States Constitution as well as 42 U.S.C. § 1983 against defendants Ms. Suttenfield and Dr. Baker in their individual capacities, and against defendant Board for purposes of injunctive relief. Plaintiff realleges paragraphs 1-47 as if set forth herein.

49. Plaintiff Jackson held a constitutionally protected property interest in not being placed on involuntary administrative leave from his position as Controller, barred from campus, suspended, and ultimately terminated, arising from the contractually binding promise by NIU that Plaintiff would not be deprived of that position in such manner except for reasons legitimately constituting "just cause" as set forth in the SPS Procedures.

50. Defendants deprived Plaintiff of this property interest in his continued employment as Controller by causing and effectuating his involuntary leave, suspension and termination. Plaintiff's public, abrupt, onerous, and humiliating placement on involuntary leave, and his subsequent suspension and termination caused Plaintiff to suffer direct and indirect economic loss by causing him to lose other tangible employment opportunities and making it virtually impossible for him to find employment in any position similar to the one he holds.

51. Plaintiff Jackson held a constitutionally protected liberty interest in his ability to continue seeking and obtaining future employment in the occupation, calling and profession – finance and accounting – to which he has chosen to devote his working life and in which he had

already invested substantial time, resources and effort to gain the education, training, and experience in order to perform his job duties, succeed, and prosper.

52. Defendants deprived Plaintiff of this liberty interest by publicly and abruptly placing Plaintiff on involuntary leave from his position as Controller shortly after the Coffee Fund scandal, banning him completely from all functions, facilities, and contact with personnel of his Department, cutting his access to e-mail and other forms of communication, and subsequently suspending and terminating his termination, in the highly public circumstances and manner set forth above, and by repeatedly making and publicly disseminating false, unfounded and highly damaging statements about purported unprofessional conduct by Plaintiff and about the purported reasons for his placement on involuntary leave, suspension, and termination, thereby publicly stigmatizing Plaintiff and impugning his personal and professional reputation, character, and integrity in a manner that has caused him to lose other tangible employment opportunities and has made it virtually impossible for him to find employment in his field and thereby effectively excluded him from his chosen occupation and career.

53. By engaging in the conduct described in the preceding paragraphs, including but not limited to: (1) placing Plaintiff on involuntary administrative leave and suspending him without prior investigation, notice of charges, or opportunity to respond with a settled intent to terminate him for unlawful reasons; (2) "find[ing]" and then publicizing bogus allegations of misconduct in retaliation for Mr. Jackson's refusal to immediately and voluntarily resign his employment with the University; (3) terminating Plaintiff's employment with NIU for those unlawful reasons after affording him only a defective and inadequate pre-termination process in which the specific misconduct with which he was being charged was never properly stated, the purported evidence against him was not timely or fully produced, and no actual hearing occurred

11

at which Plaintiff could properly confront and contest the arguments and evidence against him and present evidence and argument in his own defense; and (4) after the decision to terminate Plaintiff's employment, denying him any adversarial hearing process, either in the University's grievance process or otherwise, in which Plaintiff was given the opportunity to confront and contest arguments and evidence against him and present evidence and argument in his own defense, said Defendants unlawfully deprived Plaintiff of his constitutionally protected property and liberty interest, as set forth above, without procedural due process in violation of his rights under the Due Process Clause contained in the Fifth and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983.

54. Defendants' unlawful conduct, as described herein, caused Plaintiff to suffer damages including but not limited to loss of employment, loss of past and future income and benefits, loss of earning capacity, emotional distress, loss of reputation, humiliation, and embarrassment. Plaintiff has suffered and will continue to suffer such damages in the future.

55. Defendants' unlawful conduct, as described herein, was intentional and undertaken with malice and reckless indifference to Plaintiff's rights; therefore, Plaintiff seeks an award of punitive damages against these defendants in order to deter them and others similarly situated from engaging in such wrongful conduct in the future.

**COUNT II – DENIAL OF SUBSTANTIVE DUE PROCESS
UNDER THE U.S. CONSTITUTION AND 42 U.S.C. § 1983**

56. This Count is brought pursuant to the Fifth and Fourteenth Amendments to the United States Constitution as well as 42 U.S.C. § 1983 against defendants Ms. Suttenfield and Dr. Baker in their individual capacities, and against defendant Board for purposes of injunctive relief. Plaintiff realleges paragraphs 1-47 as if set forth herein.

57. Plaintiff Jackson held a constitutionally protected property interest in not being placed on involuntary administrative leave from his position as Controller, barred from campus, suspended, and ultimately terminated, arising from the contractually binding promise by NIU that Plaintiff would not be deprived of that position in such manner except for reasons legitimately constituting "just cause" as set forth in the SPS Procedures.

58. Defendants deprived Plaintiff of this property interest in his continued employment as Controller by causing and effectuating his involuntary leave, suspension and termination. Plaintiff's public, abrupt, onerous, and humiliating placement on involuntary leave, and his subsequent suspension and termination caused Plaintiff to suffer direct and indirect economic loss by causing him to lose other tangible employment opportunities and making it virtually impossible for him to find employment in any position similar to the one he holds.

59. Plaintiff Jackson held a constitutionally protected liberty interest in his ability to continue seeking and obtaining future employment in the occupation, calling and profession – finance and accounting – to which he has chosen to devote his working life and in which he had already invested substantial time, resources and effort to gain the education, training, and experience in order to perform his job duties, succeed, and prosper.

60. Defendants deprived Plaintiff of this liberty interest by publicly and abruptly placing Plaintiff on involuntary leave from his position as Controller shortly after the Coffee Fund scandal, banning him completely from all functions, facilities, and contact with personnel of his Department, cutting his access to e-mail and other forms of communication, and subsequently suspending and terminating his termination, in the highly public circumstances and manner set forth above, and by repeatedly making and publicly disseminating false, unfounded and highly damaging statements about purported unprofessional conduct by Plaintiff and about

13

the purported reasons for his placement on involuntary leave, suspension, and termination, thereby publicly stigmatizing Plaintiff and impugning his personal and professional reputation, character, and integrity in a manner that has caused him to lose other tangible employment opportunities and has made it virtually impossible for him to find employment in his field and thereby effectively excluded him from his chosen occupation and career.

      61.    By engaging in the conduct described in the preceding paragraphs, including but not limited to: (1) placing Plaintiff on involuntary administrative leave and suspending him without prior investigation, notice of charges, or opportunity to respond with a settled intent to terminate him for unlawful reasons; (2) "find[ing]" and then publicizing bogus allegations of misconduct in retaliation for Mr. Jackson's refusal to immediately and voluntarily resign his employment with the University; (3) terminating Plaintiff's employment with NIU for those unlawful reasons after affording him only a defective and inadequate pre-termination process in which the specific misconduct with which he was being charged was never properly stated, the purported evidence against him was not timely or fully produced, and no actual hearing occurred at which Plaintiff could properly confront and contest the arguments and evidence against him and present evidence and argument in his own defense; (4) after the decision to terminate Plaintiff's employment, denying him any adversarial hearing process, either in the University's grievance process or otherwise, in which Plaintiff was given the opportunity to confront and contest arguments and evidence against him and present evidence and argument in his own defense; and (5) continuing a pattern and practice of threatening to bring and bringing bogus and unsubstantiated charges alleging wrongdoing against employees who do not voluntarily resign simply because Dr. Baker believes it is "time [for them] to go," said Defendants acted in a manner that shocks the conscience and denied Plaintiff's right to substantive due process in

14

violation of his rights under the Due Process Clause contained in the Fifth and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983.

62. The available state law remedies either do not exist or are inadequate to properly remedy the adverse public and personal damage done by Defendants' attempts to impair, subvert, and punish Plaintiff for refusing to cooperate with them and abandon his employment, and to prevent and deter such malicious injurious misconduct by Defendants and others in the future.

63. Defendants' unlawful conduct, as described herein, caused Plaintiff to suffer damages including but not limited to loss of employment, loss of past and future income and benefits, loss of earning capacity, emotional distress, loss of reputation, humiliation, and embarrassment. Plaintiff has suffered and will continue to suffer such damages in the future.

64. Defendants' unlawful conduct, as described herein, was intentional and undertaken with malice and reckless indifference to Plaintiff's rights; therefore, Plaintiff seeks an award of punitive damages against these defendants in order to deter them and others similarly situated from engaging in such wrongful conduct in the future.

## COUNT III – CONSPIRACY
### (against Defendants Baker and Suttenfield only)

65. Plaintiff realleges paragraphs 1-47 as if set forth herein.

66. Dr. Baker, Ms. Suttenfield, and other co-conspirators, known and not yet known to Plaintiff, reached an agreement amongst themselves to violate Mr. Jackson's constitutional rights in the manner described above. As a result, the Defendants, acting in concert with other known and unknown co-conspirators, conspired to accomplish an unlawful purpose by unlawful means.

67. In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in the joint activity.

15

68. The misconduct described above was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

69. Defendants' unlawful conduct, as described herein, caused Plaintiff to suffer damages including but not limited to loss of employment, loss of past and future income and benefits, loss of earning capacity, emotional distress, loss of reputation, humiliation, and embarrassment. Plaintiff has suffered and will continue to suffer such damages in the future.

70. Defendants' unlawful conduct, as described herein, was intentional and undertaken with malice and reckless indifference to Plaintiff's rights; therefore, Plaintiff seeks an award of punitive damages against these defendants in order to deter them and others similarly situated from engaging in such wrongful conduct in the future.

## COUNT IV – ILLINOIS WHISTLEBLOWER ACT

71. Plaintiff incorporates paragraphs 1-47 as though fully restated herein.

72. At all times relevant, Defendants were "employers" as defined by the Illinois Whistleblower Act, 740 ILCS 140/5.

73. At all times relevant, Plaintiff was an "employee" as defined by 740 ILCS 140/5.

74. Illinois state law requires that certain contracts be put out for bid, including the contract that Dr. Baker ordered the Plaintiff to sign off on, in order to pay the outside search firm that had found and hired Ms. Suttenfield.

75. By refusing to sign off on the contract, the Plaintiff refused to participate in an activity that would have resulted in a violation of Illinois laws governing the bidding process.

76. Defendants terminated Plaintiff in violation of 740 ILCS 175/15(b) because he refused to sign off on Ms. Suttenfield's contract with Registry.

77. Defendants retaliated against the Plaintiff in violation of 740 ILCS 175/15(b).

## COUNT V – TORTIOUS INTEFERENCE WITH EMPLOYMENT
(against Defendants Suttenfield and Baker only)

78. Plaintiff incorporates paragraphs 1-47 as though fully restated herein.

79. Plaintiff was employed by, and had an interest in continued employment with, NIU, which included the ability to enjoy and take advantage of all the privileges and benefits of such employment, both monetary and non-monetary.

80. Defendants Suttenfield and Baker were aware of Plaintiff's employment with, and in his interest in his continued employment with, the University.

81. Defendants Suttenfield and Baker, acting in their individual capacities, purposefully interfered with Plaintiff's employment with NIU and his expectations of continued employment with the University to his detriment and to their benefit.

82. As a proximate result of Defendants' acts of interference, Plaintiff has suffered damages in an amount to be proven at trial.

83. The aforementioned acts of Defendants Suttenfield and Baker were willful, wanton, malicious, and oppressive, and justify the awarding of exemplary and punitive damages.

WHEREFORE, Plaintiff requests a trial by jury and that after a trial on the merits the Court enter judgment on his behalf on all claims and award the following relief:

A. Permanently enjoining Defendants from engaging in the wrongdoing described herein;

B. Reinstating the Plaintiff as Controller and ordering the University to immediately rescind his involuntary leave;

C. Expunging all reference and material relating to this matter from the University's records, as well as Mr. Jackson's personnel file;

D. Compensating the Plaintiff for lost back pay and benefits;

  E.  Compensating the Plaintiff for front pay and lost future benefits;

  F.  Compensating the Plaintiff for loss of earning capacity;

  G.  Compensating the Plaintiff for reputational damage, humiliation and emotional distress in an amount to be determined at trial;

  H.  Other compensatory damages in an amount to be determined at trial;

  I.  Statutory damages under the Illinois Whistleblower Act;

  J.  Punitive damages in an amount to be determined at trial;

  K.  Reasonable attorneys' fees and costs; and

  L.  Such other relief as the Court may deem just and proper.

Dated: October 2, 2015         Respectfully submitted,

Alejandro Caffarelli, #06239078     KEITH JACKSON
Lorrie T. Peeters, #6290434
Alexis D. Martin, #06309619
Caffarelli & Associates, Ltd.       By: /s/ Alejandro Caffarelli
224 S. Michigan Ave., Suite 300      Attorney for Plaintiff
Chicago, Illinois 60604
Tel. (312) 763-6880